IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF ALABAMA
SOUTHERN DIVISION

| | |  |
|---|---|---|
| **THOMAS E. REYNOLDS, as Trustee,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| v. | ] | 2:18-cv-00514-ACA |
| | ] | |
| **BEHRMAN CAPITAL IV L.P, et al.,** | ] | |
| | ] | |
| **Defendants.** | ] | |

## MEMORANDUM OPINION

Plaintiff Thomas Reynolds, as chapter 7 trustee for the estates of Atherotech Inc. ("Atherotech") and Atherotech Holdings ("Holdings") has sued thirty related defendants, seeking to recover purportedly fraudulent transfers of a dividend recapitalization performed by Atherotech before Atherotech and Holdings declared bankruptcy. The thirty defendants have filed four motions to dismiss for lack of jurisdiction under Federal Rule of Civil Procedure 12(b)(2) or, in the alternative, for failure to state a claim under Rule 12(b)(6). (Docs. 28, 33, 37, 39).

Because the court finds that it lacks personal jurisdiction over each defendant, the court **WILL GRANT** the motions and **WILL DISMISS** each defendant **WITHOUT PREJUDICE**. The court will also permit Plaintiff Thomas Reynolds leave to file a proper motion to amend the complaint, attaching to it a

proposed amended complaint that omits any facts, defendants, and claims that are related only to the previously severed cases.

I. **BACKGROUND**

In deciding a Rule 12(b)(2) motion to dismiss for lack of personal jurisdiction, the court must accept as true the factual allegations made in the complaint unless the defendant contradicts those allegations with evidence. *Posner v. Essex Ins. Co.*, 178 F.3d 1209, 1215 (11th Cir. 1999).

Before setting out the facts underlying this case, the court must discuss how the parties are related to each other. The plaintiff, Mr. Reynolds, is the chapter 7 trustee for the estates of Atherotech and Holdings. (Doc. 1-1 at 10). Atherotech was wholly owned by Holdings, which was in turn owned by three shareholders: Defendant Behrman Capital IV LP ("Fund IV"), Defendant Behrman Brothers IV, LLC ("Behrman Brothers"), and Defendant MidCap Financial Investment, LP ("MidCap"). (Doc. 1-1 at 15–16 ¶¶ 44–45). Fund IV was Holdings' majority shareholder, owning 94% of its stock and controlling three of its five seats. (*Id.* at 23 ¶ 98). Behrman Brothers—which was also Fund IV's general partner—and MidCap owned the remaining shares in Holdings. (*Id.* at 17 ¶ 46, 24 ¶ 99).

The thirty defendants can be grouped as follows: (1) Fund IV; (2) Fund IV's fifteen limited partners (the "Limited Partners"); (3) Behrman Brothers and its

2

twelve members (the "Behrman Brothers Defendants"); and (4) MidCap. (*See* Doc. 1-1 at 16–18 ¶¶ 46–48).

According to the complaint, Atherotech operated a laboratory that conducted testing on blood cholesterol levels. (Doc. 1-1 at 20 ¶ 67). It paid physicians who ordered such testing a processing and handling fee, also known as a P&H fee. (*Id.* ¶¶ 69–70). Although Medicare rules and regulations prohibit the payment of P&H fees, Atherotech would nevertheless submit claims that included the payment of those fees to Medicare and other federal healthcare programs.[1] (*Id.* at 20–21 ¶¶ 71, 74).

In 2012, the Department of Justice began to investigate Atherotech's payments of P&H fees for violation of the federal False Claims Act, 31 U.S.C. §§ 3729–3730, and the federal Anti-Kickback Statute, 42 U.S.C. § 1320a-7b. (Doc. 1-1 at 21 ¶¶ 78–79, 28 ¶ 122). Violations of the False Claims Act can result in a per-claim penalty of between $5,500 and $11,000, in addition to treble damages. *See* 31 U.S.C. § 3729(a).

Despite knowing of the investigation, Atherotech continued to make P&H fee payments. (*See* Doc. 1-1 at 22 ¶¶ 81–82). From January 2011 through June 2013, Medicare reimbursed Atherotech about $35,691,000 for tests Atherotech had run that were associated with P&H fee payments. (*Id.* at 22 ¶ 82). Accordingly,

---

[1] Defendants dispute whether the practice was prohibited at the time, but that dispute does not affect this memorandum opinion.

3

Mr. Reynolds contends that by June 2013, Atherotech had $107,073,000 in contingent liabilities for violations of the False Claims Act. (*Id.* ¶¶ 82–85).

In 2013, while the Department of Justice investigation was ongoing, Atherotech entered a credit agreement with certain lenders under which the lenders loaned Atherotech $40.5 million. (Doc. 1-1 at 22–23 ¶¶ 88–90, 23 ¶ 97). Atherotech then executed a dividend recapitalization under which it paid Holdings' shareholders—Fund IV, Behrman Brothers, and MidCap—$31,559,342.45. (*Id.* at 22–23 ¶¶ 86, 97–98).

Fund IV received $31,433,596.05 from the dividend; Behrman Brothers received $87,374; and MidCap received $351,890.70. (Doc. 1-1 at 23–24 ¶¶ 98–99). Fund IV then distributed its portion of the dividend to its Limited Partners and its general partner Behrman Brothers, and Behrman Brothers distributed its portion of the Fund IV dividend to its twelve members. (Doc. 1-1 at 24–25 ¶¶ 102, 104).

By July 2014, Atherotech could no longer pay P&H fees and its revenues decreased significantly. (Doc. 1-1 at 29 ¶¶ 134–35). From July through October 2015, Fund IV invested $6.9 million into Atherotech. (*Id.* at 30 ¶¶ 137–39).

In March 2016, Atherotech and Holdings filed for bankruptcy. (Doc. 1-1 at 16–17 ¶ 40). The bankruptcy court appointed Mr. Reynolds as the Chapter 7

trustee for both companies (*id.* at 16 ¶ 41), and he eventually sold Atherotech's assets for $19.6 million. (*Id.* at 30 ¶ 141).

In 2018, Mr. Reynolds, as trustee for the estates of Holdings and Atherotech, filed this lawsuit in state court, asserting the following claims:[2]

> Count One: intentionally fraudulent transfer, under 11 U.S.C. § 544 and Ala. Code § 8-9A-4(a), against Fund IV and MidCap
>
> Count Two: constructively fraudulent transfer, under 11 U.S.C. § 544 and Ala. Code § 8-9A-4(c), against Fund IV and MidCap
>
> Count Three: constructively fraudulent transfer, under 11 U.S.C. § 544 and Ala. Code § 8-9A-5(a), against Fund IV and MidCap
>
> Count Four: recovery of fraudulent transfer, under 11 U.S.C. § 550(a)(1), against Fund IV, Behrman Brothers, and MidCap
>
> Count Five: recovery of fraudulent transfer, under 11 U.S.C. § 550(a)(1), against Behrman Brothers and the Limited Partners
>
> Count Six: recovery of fraudulent transfer, under 11 U.S.C. § 550(a)(2), against Behrman Brothers and the Limited Partners
>
> Count Seven: recovery of fraudulent transfer, under 11 U.S.C. § 550(a)(2), against Behrman Brothers' members

(Doc. 1-1 at 30–34; *see also* Doc. 86 at 11; Doc. 87 at 11).

Defendants removed the case to this court under 28 U.S.C. § 1441 on the basis that the complaint implicated significant federal issues and under 28 U.S.C. § 1452(a) on the basis that, pursuant to 28 U.S.C. § 1334(a), the court has

---

[2] The complaint actually asserted thirteen claims against thirty-two defendants. (*See* Doc. 1-1). The court severed the claims against two of the defendants, and the only claims remaining in this case are the ones listed in this memorandum opinion.

5

jurisdiction under the Bankruptcy Code. (Doc. 1 at 3, 11). The court concluded that this case does not implicate a significant federal issue, but that Counts One through Seven "arise under" or "relate to" the Bankruptcy Code. (*Id.* at 9–12). Accordingly, the court found that removal of this action was authorized by § 1452(a).

## II. DISCUSSION

All of the defendants move to dismiss the complaint under Federal Rule of Civil Procedure 12(b)(2) for lack of personal jurisdiction and, in the alternative, under Rule 12(b)(6) for failure to state a claim. Because the court concludes that Mr. Reynolds has not established that the court has personal jurisdiction over any of the defendants, the court will not address any of the arguments about the merits of his claims.

### 1. Personal Jurisdiction

Under Federal Rule of Civil Procedure 12(b)(2), the court may dismiss a complaint for "lack of personal jurisdiction." To withstand a Rule 12(b)(2) motion, the plaintiff "bears the initial burden of alleging in the complaint sufficient facts to make out a prima facie case of jurisdiction." *United Techs. Corp. v. Mazer*, 556 F.3d 1260, 1274 (11th Cir. 2009). Where the defendant challenges personal jurisdiction and submits affidavits in support of its position, the burden

shifts back to the plaintiff to produce evidence supporting jurisdiction. *Meier ex rel. Meier v. Sun Int'l Hotels, Ltd.*, 288 F.3d 1264, 1269 (11th Cir. 2002).

The Supreme Court has recognized two kinds of personal jurisdiction: general and specific. *Bristol-Myers Squibb Co. v. Superior Court of Cal., San Francisco Cty.*, 137 S. Ct. 1773, 1779–80 (2017). Mr. Reynolds has made no argument that the court has general personal jurisdiction over any of the defendants; accordingly, he has waived any reliance on general personal jurisdiction and the court will address only whether it has specific personal jurisdiction.

A court with specific jurisdiction may hear only claims that "aris[e] out of or relate[ ] to the defendant's contacts with the forum." *Daimler AG v. Bauman*, 571 U.S. 117, 127 (2014) (quotation marks omitted). An entity is subject to specific personal jurisdiction where it has "minimum contacts" with the forum. But "the forum" means different things depending on the case. In most cases, Federal Rule of Civil Procedure 4 permits the court to exercise personal jurisdiction over a defendant "who is subject to the jurisdiction of a court of general jurisdiction in the State where the district court is located." *See* Fed. R. Civ. P. 4(k)(1)(A), (C).[3] Because state courts are limited by the Fourteenth Amendment to the United States Constitution, the question in those cases is whether the court's exercise of

---

[3] Rule 4(k)(2), which also addresses the court's personal jurisdiction, does not apply in this case because this court does not have exclusive jurisdiction over the claims asserted.

jurisdiction would violate the Fourteenth Amendment's Due Process Clause. *See Sloss Indus. Corp. v. Eurisol*, 488 F.3d 922, 925 (11th Cir. 2007). Under the Fourteenth Amendment, the court must determine whether the defendant has "certain minimum contacts with [the State] such that the maintenance of the suit does not offend traditional notions of fair play and substantial justice." *Int'l Shoe Co.*, 326 U.S. at 316.

But Rule 4(k) also provides for personal jurisdiction over a defendant "when authorized by a federal statute." Fed. R. Civ. P. 4(k)(1)(C). This refers to federal statutes that provide for nationwide service of process. *See Republic of Panama v. BCCI Holdings (Luxembourg) S.A.*, 119 F.3d 935, 942 (11th Cir. 1997) ("When a federal statute provides for nationwide service of process, it becomes the statutory basis for personal jurisdiction."). In those cases, "the constitutional limits of due process derive from the Fifth, rather than the Fourteenth, Amendment." *Id.* Under the Fifth Amendment, the court must determine only whether the defendant has minimum contacts with the United States. *Id.* at 946–47.

Mr. Reynolds contends that the court must analyze whether it has personal jurisdiction under the Fifth Amendment. (Doc. 85 at 8–11). He asserts that because this court has already determined that it has subject matter jurisdiction under the Bankruptcy Code, the Federal Rules of Bankruptcy Procedure, which provide for nationwide service of process, govern. (*Id.* at 8). Defendants argue

8

that the doctrine of derivative removal jurisdiction precludes a finding of personal jurisdiction under the Fifth Amendment. (Doc. 95 at 9–12).[4]

In general, "[t]he jurisdiction of the federal court on removal is, in a limited sense, a derivative jurisdiction. If the state court lacks jurisdiction of the subject-matter or of the parties, the federal court acquires none, *although it might in a like suit originally brought there have had jurisdiction*." *Lambert Run Coal Co. v. Baltimore & O.R. Co.*, 258 U.S. 377, 382 (1922) (emphasis added). The parties and the court refer to that rule as the derivative removal jurisdiction doctrine.

Congress has abrogated the derivative removal jurisdiction doctrine for cases removed under 28 U.S.C. § 1441, the general removal statute. 28 U.S.C. § 1441(f) ("The court to which a civil action is removed under this section is not precluded from hearing and determining any claim in such civil action because the State court from which such civil action is removed did not have jurisdiction over that claim."); *see Hollis v. Fla. State Univ.*, 259 F.3d 1295, 1298 (11th Cir. 2001). But the plain language of § 1441(f) makes clear that Congress has not abrogated the rule for cases removed under other removal statutes—it specifically applies only to civil actions "removed under *this section*." *See* 28 U.S.C. § 1441(f) (emphasis added); *see also Lopez v. Sentrillon Corp.*, 749 F.3d 347, 351 (5th Cir.), *as revised*

---

[4] Fund IV and the Behrman Brothers Defendants adopt and incorporate the Limited Partners' arguments about the applicability of Bankruptcy Rule 7004. (Doc. 93 at 8–9; Doc. 94 at 6–7). Although MidCap does not expressly adopt the Limited Partners' arguments, its arguments are the same. (Doc. 92 at 2–6).

(Apr. 28, 2014) ("The [derivative removal jurisdiction] doctrine therefore continues to apply to cases removed pursuant to other statutes . . . ."); *Bullock v. Napolitano*, 666 F.3d 281, 286 n.2 (4th Cir. 2012) ("Congress has specifically abrogated the doctrine of derivative jurisdiction in cases removed under 28 U.S.C. § 1441, but it has not done so with respect to actions removed under [a different removal statute]."); *Rodas v. Seidlin*, 656 F.3d 610, 618–19 (7th Cir. 2011) ("Congress has specifically abrogated the [derivative removal jurisdiction] doctrine only with respect to removals under the general removal statute. Given that Congress explicitly abrogated the doctrine of derivative jurisdiction only with respect to removals under Section 1441, it supports the notion that—for whatever reasons—Congress intended to keep the doctrine in place with regard to other removal provisions.") (citations omitted).

In supplemental briefing, Mr. Reynolds argues that the derivative removal jurisdiction doctrine does not affect this court's subject matter jurisdiction. (Doc. 104 at 1–5). While that may be true, the question here is not whether the doctrine divests this court of subject matter jurisdiction, but whether it precludes the court from conducting a Fifth Amendment analysis to determine whether it has personal jurisdiction over the defendants. It does.

Mr. Reynolds also argues that the doctrine does not prevent a district court from acquiring personal jurisdiction after removal. (*Id.* at 5–10). But that is

10

precisely what the doctrine does: "[i]f the state court lacks jurisdiction of the subject-matter or of the parties, the federal court acquires none, although it might in a like suit originally brought there have had jurisdiction." *Lambert Run Coal Co.*, 258 U.S. at 382.

Accordingly, even though this court has found that under 28 U.S.C. § 1334(b), it has subject matter jurisdiction over this case, the Fifth Amendment analysis is not applicable in this case. Instead, the court must determine whether the state court in which the case was originally filed would have been able to exercise specific personal jurisdiction over the defendants.

"Alabama's long-arm statute permits the exercise of personal jurisdiction to the fullest extent constitutionally permissible." *Sloss Indus. Corp. v. Eurisol*, 488 F.3d 922, 925 (11th Cir. 2007). Thus, the court must examine "whether exercising jurisdiction over the defendant would violate the Due Process Clause of the Fourteenth Amendment, which requires that the defendant have minimum contacts with the forum state and that the exercise of jurisdiction not offend 'traditional notions of fair play and substantial justice.'" *Id.* (quoting *Int'l Shoe Co. v. Washington*, 326 U.S. 310, 316 (1945)).

Mr. Reynolds did not argue in his briefs or at oral argument that the Behrman Brothers Defendants and the Limited Partners had minimum contacts with Alabama. (*See* Doc. 86 at 6–11 (brief in response to Behrman Brothers);

Doc.87 at 6–11 (brief in response to Limited Partners)). Nor can the court discern from the complaint any basis to find that those defendants had the requisite minimum contacts. (*See generally* Doc. 1-1 at 9–40). Accordingly, the court **WILL GRANT** the motion to dismiss the Behrman Brothers Defendants and the Limited Partners.

But Mr. Reynolds did argue that Fund IV and MidCap each had minimum contacts with Alabama sufficient to give the court personal jurisdiction, based on the test the Supreme Court set out in *Calder v. Jones*, 465 U.S. 783, 788 (1984). He asserts that (1) Fund IV and MidCap had business dealings with Atherotech and Holdings, which had their principal place of business in Alabama; (2) they accepted fraudulently transferred funds from Holdings; and (3) the fraudulently transferred funds caused the ruin of Atherotech. (Doc. 85 at 13–15; Doc. 88 at 4–6).

In *Calder*, a national magazine based in Florida but with a large circulation in California published an article about the plaintiff. 465 U.S. at 784–85. The defendant-reporter, who lived in Florida, frequently traveled to California for business and called sources in California for the information that appeared in the article. *Id.* at 785. Before publishing the article, he also called the plaintiff at her California home and read the article to her husband. *Id.* at 785–86. The other defendant was the president and editor of the magazine, who oversaw "just about

every function" of the magazine, "reviewed and approved the initial evaluation of the subject of the article," edited it before publication, and declined to print a retraction after its publication. *Id.* at 786.

The Supreme Court held that because "California is the focal point both of the story and of the harm suffered," the defendants' contacts with California were sufficient to give the California court personal jurisdiction. *Calder*, 465 U.S. at 788–89. The Eleventh Circuit has explained that the *Calder* effects test requires "the commission of an intentional tort, expressly aimed at a specific individual in the forum whose effects were suffered in the forum." *Licciardello v. Lovelady*, 544 F.3d 1280, 1288 (11th Cir. 2008).

Mr. Reynolds contends that under *Calder*, he has demonstrated that Fund IV had sufficient minimum contacts with Alabama because it "devised the scheme to undertake the dividend recapitalization," it was the driving force in executing the dividend recapitalization, and the effects of the dividend recapitalization were felt in Alabama. (Doc. 85 at 15). He contends that MidCap had sufficient minimum contacts with Alabama because it accepted the fraudulent transfer and it had "business dealings with an ownership interest in" Atherotech and Holdings. (Doc. 88 at 6).

Mr. Reynolds reads *Calder* too broadly. He cites a number of cases that he says stand for the proposition that the mere acceptance of a fraudulent transfer is

enough to establish minimum contacts with a State. (*Id.* at 14–15). For example, he refers to *In re Chase & Sanborn Corp.*, 835 F.2d 1341 (11th Cir. 1988), *reversed on other grounds sub. nom Granfinanciera, S.A. v. Nordberg*, 492 U.S. 33 (1989), which involved the question whether the court had personal jurisdiction based on the defendants' minimum contacts with the United States. The Eleventh Circuit held that fraudulent transfers of U.S. currency made from New York and Miami bank accounts into the defendants' Miami bank accounts sufficed to establish minimum contacts with the United States. *Id.* at 1346. But *Chase & Sanborn* is distinguishable because in that case, the defendants had bank accounts located in the forum (the United States), whereas in this case, no allegation or evidence indicates that Fund IV or MidCap had Alabama bank accounts; the only alleged connection to Alabama is that Atherotech and Holdings had their principal place of business here.

The other cases Mr. Reynolds cites are non-binding but persuasive decisions, and Mr. Reynolds again reads them too broadly. *See Montoya v. Akbari*, 2016 WL 6783245, at *3 (Bankr. D.N.M. Nov. 14, 2016) (intentional acceptance of fraudulent transfer enough to establish minimum contacts with the United States); *Mullins v. TestAmerica, Inc.*, 564 F.3d 386, 401–02 (5th Cir. 2009) (intentional acceptance of fraudulent transfer that defendant had engineered enough to establish minimum contacts); *Gambone v. Lite Rock Drywall*, 288

14

F. App'x 9, 13–14 (3d Cir. 2008) (finding personal jurisdiction where the defendant "participated in a fraudulent conveyance"); *Sugartown Worldwide LLC v. Shanks*, 2015 WL 1312572, at *6–7 (E.D. Pa. 2015)(finding personal jurisdiction where defendant was actively involved in the fraudulent transfer); *Sourcing Mgmt., Inc. v. Sinclair, Inc.*, 118 F. Supp. 3d 899, 911–12 (N.D. Tex. 2015) (finding personal jurisdiction where the defendant "collude[ed] to transfer . . . assets"); *Racher v. Lusk*, 2013 WL 6037122, at *3 (W.D. Okla. 2013) (finding personal jurisdiction where defendants operated, managed, and controlled the transferor); *State Farm Mut. Auto. Ins.c Co. v. Tz'Doko V'Chesed of Klausenberg*, 543 F. Supp. 2d 424, 430–31 (E.D. Pa. 2008) (finding personal jurisdiction in a fraudulent transfer case where the plaintiff alleged that the defendants' actions were "malicious and outrageous").

In *Mullins*, the Fifth Circuit expressed skepticism "that a non-resident defendant's receipt of assets transferred with an intent to hinder, delay, or defraud a creditor *ipso facto* establishes personal jurisdiction in the state where a complaining creditor resides." 564 F.3d at 400. This court agrees. "The 'effects test in *Calder* does not supplant the need to demonstrate minimum contacts that constitute purposeful availment, that is, conduct by the non-resident defendant that invoked the benefits and protections of the state or was otherwise purposefully directed toward a state resident." *Id.* All of the cases Mr. Reynolds cite involve

active involvement in the fraudulent transfer, and that is the standard this court must use as well.

Mr. Reynolds has not alleged facts or presented evidence showing that MidCap was involved enough in the alleged scheme to have minimum contacts with Alabama. MidCap was a minority shareholder in Holdings and Mr. Reynolds has not alleged that it was in any way involved in the decision to do the dividend recapitalization. All Mr. Reynolds has presented is a vague statement in his brief—which constitutes neither a valid factual allegation nor evidence—that MidCap had "business dealings with" Atherotech and Holdings. (Doc. 88 at 6). He has not made allegations sufficient to allow this court to exercise personal jurisdiction over MidCap.

Similarly, Mr. Reynolds has not alleged facts sufficient to demonstrate that Fund IV was involved in Atherotech's decision to do the dividend recapitalization. The complaint alleges that Fund IV is the majority shareholder of Holdings, controls a majority of Holdings' board seats, and that it actively invested $6.9 million in Holdings after the dividend recapitalization. (Doc. 1-1 at 23 ¶ 98, 30 ¶¶ 137–39). That may be enough to demonstrate that Fund IV controlled Holdings. But the complaint does not allege that either Fund IV or Holdings exercised active control over Atherotech. (*See* Doc. 1-1 at 23 ¶ 98). To the contrary, the complaint

alleges that "*Atherotech* determined that it would execute a dividend recapitalization." (*Id.* at 22 ¶ 86) (emphasis added).

All of the wrongs alleged in the complaint stem from the decision to execute the dividend recapitalization: at the hearing Mr. Reynolds argued that the entire purpose of the recapitalization was to liquidate the company before the DOJ's investigation could result in massive fines. Accordingly, without a connection drawn from Fund IV to Holdings to Atherotech, Mr. Reynolds cannot meet the *Calder* effects test because he cannot show that Fund IV committed an intentional act expressly aimed at Atherotech. All he can show is that Atherotech decided to execute a dividend recapitalization, perhaps with fraudulent intent, and afterward Holdings distributed those funds to Fund IV and other investors.

At the hearing, Mr. Reynolds emphasized paragraph 143 of his complaint, in which he stated that "Fund IV—by virtue of controlling three of the five seats on the Holdings Board—controlled [Holdings and Atherotech] and were insiders of [Holdings and Atherotech]." He argues that this paragraph is enough to establish that Fund IV exercised active control over both Holdings and Atherotech. But the court cannot accept conclusory allegations in determining whether a plaintiff has made a prima facie case of personal jurisdiction. *See Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318 (11th Cir. 2006) (rejecting the plaintiff's "vague and conclusory allegations" as "insufficient to establish a prima facie case of personal jurisdiction"

alleges that "*Atherotech* determined that it would execute a dividend recapitalization." (*Id.* at 22 ¶ 86) (emphasis added).

All of the wrongs alleged in the complaint stem from the decision to execute the dividend recapitalization: at the hearing Mr. Reynolds argued that the entire purpose of the recapitalization was to liquidate the company before the DOJ's investigation could result in massive fines. Accordingly, without a connection drawn from Fund IV to Holdings to Atherotech, Mr. Reynolds cannot meet the *Calder* effects test because he cannot show that Fund IV committed an intentional act expressly aimed at Atherotech. All he can show is that Atherotech decided to execute a dividend recapitalization, perhaps with fraudulent intent, and afterward Holdings distributed those funds to Fund IV and other investors.

At the hearing, Mr. Reynolds emphasized paragraph 143 of his complaint, in which he stated that "Fund IV—by virtue of controlling three of the five seats on the Holdings Board—controlled [Holdings and Atherotech] and were insiders of [Holdings and Atherotech]." He argues that this paragraph is enough to establish that Fund IV exercised active control over both Holdings and Atherotech. But the court cannot accept conclusory allegations in determining whether a plaintiff has made a prima facie case of personal jurisdiction. *See Snow v. DirecTV, Inc.*, 450 F.3d 1314, 1318 (11th Cir. 2006) (rejecting the plaintiff's "vague and conclusory allegations" as "insufficient to establish a prima facie case of personal jurisdiction"

over the defendant). Mr. Reynolds must allege facts showing how Fund IV controlled Atherotech. And all he has alleged so far is that Fund IV controlled Holdings and Holdings was the sole shareholder of Atherotech. That allegation is insufficient.

Accordingly, the court **WILL GRANT** the motion to dismiss all defendants for lack of personal jurisdiction.

2. Amendment

At the hearing, Mr. Reynolds requested leave to amend the complaint. Under Federal Rule of Civil Procedure 15, the time for amendment as a matter of course has passed. *See* Fed. R. Civ. P. 15(a)(1). "In all other cases, a party may amend its pleading only with the opposing party's consent or the court's leave. The court should freely give leave when justice so requires." Fed. R. Civ. P. 15(a)(2). Justice does not require permitting amendment when any amendment would be futile. *Jameson v. Arrow Co.*, 75 F.3d 1528, 1534–35 (11th Cir. 1996). In addition, a request for leave to amend should be accompanied by "the substance of the proposed amendment or . . . a copy of the proposed amendment." *Cita Tr. Co. AG v. Fifth Third Bank*, 879 F.3d 1151, 1157 (11th Cir. 2018).

Mr. Reynolds has represented that he could amend his complaint to establish personal jurisdiction, but he has not explained how. Fund IV opposed amendment,

arguing that Mr. Reynolds has already had the opportunity to do discovery in other cases pending in state court, including a long deposition of Fund IV's corporate representative.

The court cannot evaluate whether amendment would be futile without more information. Accordingly, the court will not allow amendment at this point. But the court will allow Mr. Reynolds to file a formal motion to amend, attaching to it his proposed amended complaint. The complaint as it currently stands includes facts, defendants, and claims that the court has already severed from this case. To aid the court in evaluating the amended complaint, Mr. Reynolds must omit any facts, defendants, and claims that are related only to the severed cases.

## III. CONCLUSION

The court **WILL GRANT** the motions to dismiss on the basis that the court lacks personal jurisdiction over the defendants, and **WILL DISMISS** each defendant **WITHOUT PREJUDICE**. The court will permit Mr. Reynolds to file a motion amend the complaint. The amended complaint must omit any facts, defendants, and claims that are related only to the severed cases.

**DONE** and **ORDERED** this February 11, 2019.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE