FILED

2022 Jan-18  PM 04:13
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
## SOUTHERN DIVISION

| | | |
|---|---|---|
| **THOMAS E. REYNOLDS, as Trustee,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **2:18-cv-00514-ACA** |
| | ] | |
| **BEHRMAN CAPITAL IV L.P, et al.,** | ] | |
| | ] | |
| **Defendants.** | ] | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Plaintiff Thomas Reynolds, as chapter 7 trustee for the estates of Atherotech Inc. ("Atherotech") and Atherotech Holdings ("Holdings") filed suit against thirty related defendants, seeking to recover purportedly fraudulent transfers of a dividend recapitalization performed by Atherotech before Atherotech and Holdings declared bankruptcy. This court dismissed the case with leave to amend (doc. 108), and Mr. Reynolds filed an amended complaint against only two of those defendants (doc. 115), which the court also dismissed (doc. 139). The Eleventh Circuit reversed this court's dismissal. *Reynolds v. Behrman Capital IV LP*, 988 F.3d 1314 (11th Cir. 2021) ("*Behrman Capital*"). Now on remand, Mr. Reynolds moves to file a second amended complaint that re-names all thirty defendants and bolsters some of the factual allegations. (Doc. 153). Twenty-nine of the defendants oppose amendment.

(Docs. 155, 156).  One defendant—MidCap Financial Investment, LP ("Midcap")—did not respond.

The twenty-nine defendants who oppose amendment are divided into two groups: the "Fund IV Defendants" and the "Foreign Limited Partners."  The Foreign Limited Partners are AXA Primary Fund America IV, LP; AXA Private Capital I, LP; Partners Group Direct Investments 2006, LP; Partners Group Global Opportunities Subholding Limited; PE Holding USD Gmbh; Stepstone Private Equity Partners III Cayman Holdings, LP; the Governor and Company of the Bank of Ireland; Varma Mutual Pension Insurance Company; and ASF III Bluenote Limited.  (Doc. 156 at 2–3).  They oppose amendment based on lack of personal jurisdiction and futility.  (*Id.* at 3).  Mr. Reynolds concedes that the court lacks personal jurisdiction over the Foreign Limited Partners.[1]  (Doc. 161).  Accordingly, the court **DENIES IN PART** Mr. Reynolds' motion to amend to the extent the proposed second amended complaint seeks to add the Foreign Limited Partners as defendants.  The court will not address the Foreign Limited Defendants or the claims against them any further.

---

[1] Specifically, Mr. Reynolds seeks dismissal of the Foreign Limited Partners without prejudice for lack of personal jurisdiction.  (Doc. 161 at 2 ¶ 1).  However, the current operative complaint, which Mr. Reynolds seeks to amend, does not name the Foreign Limited Partners (*see* doc. 115 at 1–2), so the court cannot dismiss them.  The court's earlier dismissal of those defendants for lack of personal jurisdiction was without prejudice.  (Doc. 108).

The Fund IV Defendants are Behrman Capital IV, LP ("Fund IV"); Behrman Brothers IV, LLC; Core Americas/Global Holdings, LP; CS Strategic Partners IV Investments, LP; Global Fund Partners II, LP; MetLife Insurance Company of Connecticut; Portfolio Advisors Secondary Fund, LP; StepStone Private Equity Partners III, LP; the Douglas E. Behrman Trust; the Kimberly E. Behrman Trust; Amanda Zeitlin; Greg Behrman; Gregory Chiate; Gary Dieber; Mark Grimes; Simon Lonergan; William Matthes; Michael Rappaport; Pradyut Shah; and Jeffrey Wu. (*See* doc. 155 at 1, 10 nn. 7–8). They oppose amendment solely on the ground that the proposed second amended complaint fails to state a claim. (*See id.* at 3). They also ask the court to construe their opposition to amendment as a motion to dismiss the case. (*Id.* at 18–19 & n.9). Because Mr. Reynolds' proposed second amended complaint states a claim, the court **DENIES** the Fund IV Defendants' motion to dismiss and **GRANTS IN PART** Mr. Reynolds' motion to amend. Mr. Reynolds may file a second amended complaint, but must first remove the Foreign Limited Partners listed above.

## I.     BACKGROUND

In determining whether amendment would be futile, the court must accept as true the factual allegations in the proposed second amended complaint and construe them in the light most favorable to the plaintiff. *Chang v. JPMorgan Chase Bank, N.A.*, 845 F.3d 1087, 1092 n.2 (11th Cir. 2017). Because the futility analysis

depends on whether the complaint as amended would still be subject to dismissal—and because the Fund IV Defendants ask the court to construe their opposition to amendment as a motion to dismiss—the court uses the standard applicable to motions to dismiss. *See id.* Under that standard, a court may not consider evidence outside the pleadings unless the court converts the motion to one for summary judgment. *See* Fed. R. Civ. P. 12(d). However, the court can consider documents incorporated into the complaint by reference as long as they are of undisputed authenticity and central to the plaintiffs' claims. *Horsley v. Feldt*, 304 F.3d 1125, 1134 (11th Cir. 2002). In this case, the Fund IV Defendants present several pieces of evidence outside the pleadings. The parties dispute the propriety of considering some of this evidence. (*See* doc. 155 at 23–24 & n.11; doc. 160 at 24–25). The court will discuss whether to consider each piece of evidence where appropriate.

Atherotech operated a laboratory that conducted testing on blood cholesterol levels. (Doc. 153 at 24 ¶ 58). In 2013, it began preparing to execute a dividend recapitalization, under which it would assume new debt and use that money to pay a dividend to the shareholders of its holding company, Holdings. (*Id.* at 28 ¶ 82). Holdings' shareholders were Defendants Fund IV, Behrman Brothers, and Midcap.[2] (*Id.* at 18 ¶ 42). The three shareholders controlled Atherotech through their

---

[2] The remaining defendants named in the proposed second amended complaint are either Fund IV's limited partners or Behrman Brothers' members. (Doc. 153 at 11 ¶ 5, 15–17 ¶¶ 24–35, 19 ¶¶ 43–44).

ownership and control of Holdings and they masterminded the idea of a dividend recapitalization.  (*Id.* at 23 ¶ 54, 28 ¶ 82).

To execute the planned dividend recapitalization, Atherotech had to take out a $40.5 million loan.  (*See* doc. 153 at 33 ¶¶ 110–15).  Atherotech therefore hired Houlihan Lokey, Inc. to issue an opinion about Atherotech's solvency.  (*Id.* at 29 ¶ 86).  The Fund IV Defendants have attached to their brief evidence about the solvency opinion.  (Docs. 155-2, 155-3).  Because the proposed second amended complaint expressly references the solvency opinion, it appears to be central to Mr. Reynolds' claims, and he does not dispute its authenticity, the court will consider the solvency opinion. *See Horsley*, 304 F.3d at 1134.  However, the court will also accept as true Mr. Reynolds' allegations about the information Atherotech provided to Houlihan Lokey in its analysis. *Cf. Saunders v. Duke*, 766 F.3d 1262, 1270 (11th Cir. 2014) (holding that, in deciding a motion to dismiss, the district court could not accept as true statements made in police reports attached to the complaint because the plaintiff expressly alleged that the reports were inaccurate).

Houlihan Lokey opined that, after the proposed loan: (1) Atherotech's assets would still exceed its stated liabilities and contingent liabilities, (2) Atherotech should still be able to pay its debts as they matured, and (3) Atherotech should not have unreasonably small capital for its business.  (Doc. 155-2 at 6).  In what is marked a "preliminary draft" of a PowerPoint presentation that Houlihan Lokey

planned to present to Atherotech's Board of Directors, Houlihan Lokey wrote that one capital adequacy test showed Atherotech had $54.1 to $66 million more assets that liabilities.  (Doc. 155-3 at 8).

But Houlihan Lokey's opinion was based only on Atherotech's publicly available or self-reported data.  (Doc. 155-2 at 3).  And Atherotech did not report any contingent liabilities.  (*See* doc. 155-3 at 11).  Indeed, according to Mr. Reynolds, certain leaders of Fund IV and Behrman Brothers controlled the information provided to Houlihan Lokey (doc. 153 at 29 ¶ 87), and they concealed the existence of significant contingent liabilities as well as reasonably foreseeable changes to Atherotech's business processes (*id.* at 29–30 ¶¶ 88–96).

Specifically, at the time Atherotech was planning the dividend recapitalization, it was under investigation by the Department of Justice ("DOJ") for potential violations of the False Claims Act, 31 U.S.C. §§ 3729, and the Anti-Kickback Statute, 42 U.S.C. § 1320a-7b.  (Doc. 153 at 26–27 ¶¶ 75–81).  The False Claims Act creates liability for anyone who submits a false or fraudulent claim to the government.  31 U.S.C. § 3729(a)(1).  A violation of the False Claim Act gives rise to liability for treble damages as well as a civil penalty of between $5,000 and $10,000 per false or fraudulent claim.  *Id.*  The Anti-Kickback Statute forbids the payment of remuneration to induce a person to refer anyone "for the furnishing . . . of any item or service for which payment may be made in whole or in part under a

Federal health care program." 42 U.S.C.A. § 1320a-7b(b)(1)(A).  A violation of the Anti-Kickback Statute is "a false or fraudulent claim for purposes of" the False Claims Act.  *Id.* § 1320a-7b(g).

The DOJ's investigation related to Atherotech's practice of paying processing and handling fees ("P&H fees") to physicians who used Atherotech to test blood samples.  (Doc. 153 at 27 ¶ 76).  Atherotech had paid P&H fees on and off over the years because of concerns that they might violate the Anti-Kickback Statute.  (*See id.* at 25 ¶ 64).  But in 2009, when Atherotech's competitors began paying P&H fees, Atherotech resumed its practice.  (*Id.* at 25 ¶ 65).  It did this because paying P&H fees was vital to its strategy of growing the business by increasing "direct sales" to physicians.  (*Id.* at 26 ¶¶ 72–73, 27 ¶ 78; *see id.* at 30 ¶ 96).  And in doing so, Atherotech billed federal healthcare programs for reimbursement of P&H fees paid to physicians.  (*Id.* at 25 ¶ 68).  About 80% of Atherotech's claims to Medicare involved payment of P&H fees, creating what Mr. Reynolds calculates as a contingent liability of $35,691,000, which could be trebled to $107,073,000 under the False Claims Act.  (*Id.* at 27 ¶¶ 79–81).

By 2013, when Atherotech was getting the solvency opinion from Houlihan Lokey, Atherotech knew about the DOJ's investigation into its practice of paying P&H fees.  (Doc. 153 at 27 ¶ 78, 28 ¶ 84).  But Atherotech did not tell Houlihan Lokey about the contingent liability.  (*Id.* at 29 ¶ 89).  It also did not tell Houlihan

Lokey about the importance of P&H fees to its continued financial health.  (*Id.* at 29 ¶ 88, 30 ¶¶ 94–96).  Finally, Atherotech overstated the value of its intangible assets, such as goodwill and its patents.  (*Id.* at 38 ¶ 134).  As a result, Houlihan Lokey's solvency opinion was inaccurate and unreliable.  (*Id.* at 30 ¶ 97).

Nevertheless, relying in part on the solvency opinion, Atherotech and Holdings entered into a credit agreement with certain lenders.  (Doc. 153 at 33 ¶ 110).  The Fund IV Defendants attach an excerpt of the credit agreement to their brief in opposition to amendment.  (Doc. 155-5).  Again, because Mr. Reynolds references the credit agreement, the agreement is central to his claims, and he does not appear to dispute the authenticity of the excerpt, the court will consider the excerpt.  *See Horsley*, 304 F.3d at 1134.  But again, the court must also accept Mr. Reynolds' allegations about the information provided to the lenders in reaching the agreement, as well his allegations about the parts of the agreement the Fund IV Defendants did not submit to the court.  *See Saunders*, 766 F.3d at 1270.

Under the credit agreement, the lenders, including Madison Capital Funding, LLC ("Madison"), lent Atherotech $40.5 million.  (Doc. 153 at 31 ¶ 103, 33 ¶¶ 110–12).  Atherotech gave the lenders a security interest and lien on "essentially" all of Atherotech's assets.  (*Id.* at 33 ¶ 113).  A schedule to the agreement reveals that Atherotech disclosed the DOJ investigation and represented that it was cooperating

with that investigation and "believe[d] that its practices in the areas being reviewed by DOJ are compliant." (Doc. 155-5 at 3).

In June 2013, the lenders wired Atherotech $31 million. (Doc. 153 at 33 ¶ 114). The same day, Atherotech wired that money directly to the shareholders. (*Id.* at 33 ¶ 115, 34 ¶ 117). Atherotech did not receive any consideration for this dividend payment. (*Id.* at 34 ¶ 122). By the end of the month, Atherotech had at least $51,045,820 in liabilities and no more than $45,244,096 in assets (of which 45% was derived from intangibles such as licences and goodwill), even without considering contingent liabilities associated with the P&H fees. (*Id.* at 37 ¶¶ 127–29). It did not even have the cash available to meet its payroll obligations and had to use credit to pay its employees. (*Id.* at 38 ¶ 133).

A year later, in June 2014, a federal agency issued a fraud alert explaining that payment of P&H fees may violate the Anti-Kickback Statute if "a laboratory pays a physician more than fair market value for the physician's services or for services the laboratory does not actually need or for which the physician is otherwise compensated." Dep't of Health & Human Servs., Office of Inspector Gen. Special Fraud Alert: Laboratory Payments to Referring Physicians (June 25, 2014). A month later, Atherotech had to stop paying P&H fees. (Doc. 153 at 39 ¶ 139). Its revenue dropped and, a year later—in July 2015—Fund IV had to invest $3 million into Atherotech. (*Id.* at 39 ¶ 140, 40 ¶ 142). Over the next few months, Fund IV invested

another $3.9 million in Atherotech because Atherotech lacked the money to pay its bills.  (*Id.* at 40 ¶¶ 143–44).  In December 2015, Fund IV wrote down the value of its investment in Atherotech to $1 million.  (*Id.* at 40 ¶ 145).

On March 4, 2016, Atherotech and Holdings filed for chapter 7 bankruptcy.  (Doc. 153 at 17 ¶ 36).  The bankruptcy court appointed Mr. Reynolds as the trustee for Atherotech and Holdings.  (*Id.* at 18 ¶ 37).  Mr. Reynolds eventually sold "substantially all of Atherotech's assets for $19.6 million."  (*Id.* at 40 ¶ 148).

In 2018, Mr. Reynolds filed suit against the thirty defendants named in this case as well as a law firm that had provided legal advice.  (Doc. 1-1 at 9–40).  This court severed the legal malpractice case against the law firm for misjoinder.  (Doc. 77).  The court ultimately granted summary judgment to the law firm in the severed case, and the Eleventh Circuit affirmed, explaining that "[w]e cannot say that at the time [the law firm] advised Atherotech[,] it was 'settled law,' for purposes of a legal malpractice claim, that laboratories could not legally pay P&H fees when those fees were equal to the fair market value of the services provided," especially because the law firm provided its advice before the 2014 fraud alert.  *Reynolds v. Mintz, Levin, Cohn, Ferris, Glovsky & Popeo, P.C.*, __ F. App'x __, 2021 WL 4627905, at *4 (11th Cir. Oct. 7, 2021) (unpublished) ("*Mintz Levin*").

In the meantime, this court dismissed the thirty defendants in this case for lack of personal jurisdiction and the Eleventh Circuit reversed that dismissal.  *Behrman*

*Capital*, 988 F.3d at 1325.  On remand, Mr. Reynolds moves to amend the amended complaint.  (Doc. 153).  The proposed second amended complaint asserts the following claims based on Atherotech and Holdings' payment of the dividend to the Fund IV Defendants and Midcap:

Count One: intentionally fraudulent transfer, under 11 U.S.C. § 544 and Ala. Code § 8-9A-4(a)

Count Two: constructively fraudulent transfer, under 11 U.S.C. § 544 and Ala. Code § 8-9A-4(c)

Count Three: constructively fraudulent transfer, under 11 U.S.C. § 544 and Ala. Code § 8-9A-5(a)

Count Four: recovery of fraudulent transfer, under 11 U.S.C. § 550(a)(1), from Fund IV, Behrman Brothers, and MidCap

Count Five: recovery of fraudulent transfer, under 11 U.S.C. § 550(a)(1), from Fund IV's partners

Count Six: recovery of fraudulent transfer, under 11 U.S.C. § 550(a)(2), from Fund IV's partners

Count Seven: recovery of fraudulent transfer, under 11 U.S.C. § 550(a)(2), from Behrman Brothers' members

(Doc. 1153 at 41–47).

## II.    DISCUSSION

The Fund IV Defendants' opposition to Mr. Reynolds' proposed amendment stems from their position that the proposed second amended complaint does not state a claim for either intentionally or constructively fraudulent transfer.  (Doc. 155 at 3). The court must determine whether the proposed second amended complaint "state[s]

a claim to relief that is plausible on its face." *Bell Atl. Corp. v. Twombly*, 550 U.S. 544, 570 (2007).  "A claim has facial plausibility when the plaintiff pleads factual content that allows the court to draw the reasonable inference that the defendant is liable for the misconduct alleged." *Ashcroft v. Iqbal*, 556 U.S. 662, 678 (2009).  A plausible claim for relief requires "enough fact[s] to raise a reasonable expectation that discovery will reveal evidence" to support the claim. *Twombly*, 550 U.S. at 556. A complaint need not contain detailed factual allegations, but a complaint must contain "more than labels and conclusions, and a formulaic recitation of the elements of a cause of action will not do." *Id.* at 555.

As an initial matter, the Fund IV Defendants appear to argue that a higher pleading standard than usual should apply because the fraudulent transfer claims depend on information in Atherotech's and Holdings' possession, so Mr. Reynolds, as trustee with access to their records, should already have all the evidence that might be discoverable.  (Doc. 162 at 6, 8–9).  But the Fund IV Defendants cite no caselaw holding that, where the plaintiff is a bankruptcy trustee alleging that the debtor engaged in a fraudulent transfer, the plaintiff must present the court with all of the facts in support of his claim at the pleading stage.  (*See id.*).  The court will not apply a different standard simply because Mr. Reynolds already has access to Atherotech's and Holdings' records.

Mr. Reynolds has asserted three claims of fraudulent transfer, and each of the remaining claims depend on the success of those preceding claims.  (*See* doc. 153 at 41–47).  Under 11 U.S.C. § 544, a bankruptcy trustee has the authority to avoid "any transfer of an interest of the debtor in property . . . that is voidable under applicable law by a creditor holding an unsecured claim that is allowable under section 502 of this title."  11 U.S.C. § 544(b).  The applicable law in this case is Alabama law, which provides that a debtor's transfer can be intentionally or constructively fraudulent.  *See* Ala. Code §§ 8-9A-4, 8-9A-5.

1.   Count One (Intentionally Fraudulent Transfer)

Under Alabama law, an intentionally fraudulent transfer occurs where "the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor."  Ala. Code § 8-9A-4(a).  This is the basis for Count One.  (Doc. 153 at 41).  Because this count asserts intentional fraud, Mr. Reynolds must satisfy Federal Rule of Civil Procedure 9(b)'s heightened pleading standard.  Under Rule 9(b), "[i]n alleging fraud or mistake, a party must state with particularity the circumstances constituting fraud or mistake.  Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."   Fed. R. Civ. P. 9(b).  "Particularity means that a plaintiff must plead facts as to time, place, and substance of the . . . alleged fraud, specifically the details of the . . . allegedly fraudulent acts,

when they occurred, and who engaged in them." *U.S. ex rel. Atkins v. McInteer*, 470 F.3d 1350, 1357 (11th Cir. 2006) (quotation marks omitted).

The Fund IV Defendants make several arguments about Mr. Reynolds' ability to state a claim of intentionally fraudulent transfer. First, they contend that Mr. Reynolds has not alleged facts that support fraudulent intent. (Doc. 155 at 37–42). Alabama Code § 8-9A-4(b) gives a non-exhaustive list of factors to consider in determining the existence of actual intent to hinder, delay, or defraud a creditor. Those factors include whether the transfer was to an insider, whether the debtor had been sued or threatened with suit before the transfer, whether the transfer was of substantially all the debtor's assets, whether the consideration received by the debtor was reasonably equivalent to the value of the asset transferred, whether the debtor was insolvent or became insolvent shortly after the transfer, and whether the transfer occurred shortly after the debtor incurred a substantial debt. *Id.*

The Fund IV Defendants concede that Mr. Reynolds has alleged the existence of some of these factors: a transfer to insiders of the debtors, no receipt of consideration of reasonably equivalent value, and the dividend payment occurring immediately after Atherotech incurred substantial debt. (Doc. 155 at 38). They contend that the court must disregard these three factors because those factors are always present in a dividend recapitalization and in many other common corporate transactions. (*Id.*). While the court agrees that these factors will always be present

in many corporate transactions that are not fraudulent, disregarding them entirely would mean writing them out of Alabama law whenever the challenged transaction is a dividend recapitalization. The court cannot do that.

And in any event, Mr. Reynolds has also alleged the existence of other factors. For example, he makes a well-pleaded allegation that, within a month of the dividend payment, Atherotech had over $5 million more in actual liabilities than in assets, even without considering contingent liabilities associated with paying P&H fees, such that it was unable to meet its payroll obligations without incurring more debt. (Doc. 153 at 37 ¶¶ 127–28, 38 ¶ 133). The Fund IV Defendants assert that the court cannot consider this allegation because it is based on the "book value" of Atherotech instead of "a fair valuation" of the company, and only the "fair valuation" matters for determining a company's solvency. (Doc. 155 at 21). But they do so by inserting the word "book" in the proposed second amended complaint, despite the fact that the proposed second amended complaint does not contain that word and does not define how it calculated the "value" of Atherotech's assets and liabilities. (*See* doc. 153 at 37 ¶ 127; doc. 155 at 21). At the pleading stage, the court cannot construe the allegations in the proposed amended complaint against the plaintiffs in the way the Fund IV Defendants propose.

Mr. Reynolds also alleges that Atherotech executed the dividend recapitalization while faced with a significant contingent liability and the threat of a

False Claims Act lawsuit.  (Doc. 153 at 27 ¶¶ 79–81).  The Fund IV Defendants contend that Mr. Reynolds miscalculated the contingent liability, that the *Mintz Levin* opinion forecloses any argument that Atherotech's payment of P&H fees was a *per se* violation of federal law, and that Mr. Reynolds has not plausibly alleged the threat of a lawsuit by the DOJ or a qui tam relator.  (Doc. 155 at 23–28, 39–42).  The court need not address the plausibility of Mr. Reynolds' allegations about the contingent liability or the threat of a lawsuit because his other allegations are sufficient to plausibly state a claim that Atherotech insolvent at the time or immediately after the dividend recapitalization.

The Fund IV Defendants next argue that Mr. Reynolds failed to adequately plead fraudulent intent because although he alleges that Fund IV and Holdings had fraudulent intent, he has not alleged that Fund IV and Holdings controlled Atherotech.  (Doc. 155 at 36).  For the reasons explained above, Mr. Reynolds allegations are enough to plausibly allege that Atherotech had fraudulent intent.  But even if Atherotech's intent were entirely derivative of Holdings' and Fund IV's intent, Mr. Reynolds has alleged that Holdings wholly owned Atherotech and controlled its board and that Atherotech executed the recapitalization exactly as Holdings' shareholders planned.  (Doc. 153 at 23 ¶¶ 53–54, 28 ¶¶ 82–83).  At this stage, that is sufficient to allege that Fund IV and Holdings controlled Atherotech such that their intent may be imputed to it.

The Fund IV Defendants also contend that, in violation of Rule 9(b), Mr. Reynolds has not specifically alleged that Atherotech's sole director, Mike Mullen, had fraudulent intent when he authorized the dividend recapitalization. (Doc. 155 at 35–36).  Rule 9(b) does not require pleading with particularity with respect to the intent element.  *See* Fed. R. Civ. P. 9(b) ("Malice, intent, knowledge, and other conditions of a person's mind may be alleged generally."); *Ashcroft*, 556 U.S. at 686 ("Rule 9 . .  excuses a party from pleading . . . intent under an elevated pleading standard.").   And Mr. Reynold's well-pleaded allegations about the circumstances of the alleged fraudulent transfer are sufficient, at the pleading stage, to give rise to a reasonable inference that Atherotech and Holdings intended to defraud creditors by making the dividend payment to Holdings' shareholders.

Finally, the Fund IV Defendants contend that Mr. Reynolds does not state a claim for intentionally fraudulent transfer because he has not alleged the existence of a "triggering creditor" whom Atherotech and Holdings intended to defraud.  (Doc. 155 at 31–32).  A bankruptcy trustee may avoid any transfer of an interest that a so-called "triggering creditor" would be able to void.  *See* 11 U.S.C. § 544(b)(1).  A triggering creditor is a creditor holding an unsecured claim that is allowable under the bankruptcy code, who would be able to void a debtor's transfer "under applicable law."  *Id.*   The Fund IV Defendants argue that Mr. Reynolds has identified two triggering defendants: Madison (the lender under the credit agreement) and the

United States (the potential plaintiff in a False Claims Act lawsuit), and he has not alleged actual intent to defraud either of them, so he cannot state a claim for intentionally fraudulent transfer. (Doc. 155 at 32–34).

The Fund IV Defendants have conflated the requirements for a trustee to avoid a transfer, set out in 11 U.S.C. § 544 (which requires a triggering creditor in whose place the trustee may avoid the transfer), with the requirements for finding a transfer fraudulent, set out in Alabama Code § 8-9A-4(a) (which requires only that the debtor "made the transfer with actual intent to hinder, delay, or defraud *any* creditor of the debtor" (emphasis added)). As Mr. Reynolds argues, he does not have to allege facts that, if true, would show Atherotech's or Holdings' intent to defraud Madison or the United States specifically. All he must do is allege facts showing an intent to defraud any of Atherotech's or Holdings' creditors. *See* Ala. Code § 8-9A-4(a). And, as stated above, a plaintiff may plead intent generally. Fed. R. Civ. P. 9(b); *see also Ashcroft*, 556 U.S. at 686.

Mr. Reynolds has adequately pleaded facts that give rise to an inference of intent to defraud Atherotech's and Holdings' creditors. He alleges that Atherotech and Holdings paid to insiders a dividend of substantially all the Atherotech's assets, after incurring substantial debt, without receiving any consideration, and Atherotech became insolvent immediately after the transfer. *See* Ala. Code § 8-9A-4(b); (doc. 153 at 23 ¶ 54, 28 ¶ 82, 34 ¶ 122, 37 ¶¶ 127–29, 38 ¶ 133, 42 ¶ 158). This is enough

to support a reasonable inference that the conveyance was intentionally fraudulent. *See Ashcroft*, 556 U.S. at 678; *see also* Ala. Code § 8-9A-4(b).  Accordingly, the court **GRANTS** the motion to file a second amended complaint with respect to Count One.

### 2. Count Two (Constructively Fraudulent Transfer—Unreasonably Small Capital or Inability to Pay Debts)

In Count Two, Mr. Reynolds alleges constructively fraudulent transfer, under Alabama Code § 8-9A-4(c).  That section provides that a constructively fraudulent transfer occurs if the debtor did not receive a reasonably equivalent value in exchange for the transfer and either the debtor's remaining assets "were unreasonably small in relation to the business or transaction" or the debtor "believed or reasonably should have believed that he or she would incur[ ] debts beyond his or her ability to pay as they became due."  Ala Code. § 8-9A-4(c).

The Fund IV Defendants contend that Mr. Reynolds cannot state a claim of constructively fraudulent transfer under § 8-9A-4(c) because Mr. Reynolds' allegations of unreasonably small capital or inability to pay debts are conclusory, Mr. Reynolds failed to allege Atherotech's financial condition after the dividend recapitalization, and he alleged that Atherotech did not begin to fail until a year after the recapitalization.  (Doc. 155 at 28–30; Doc. 162 at 16–17).  But contrary to those contentions, Mr. Reynolds specifically alleges that Atherotech knew that changes to its ability to pay P&H fees could affect its profits but, while under investigation for

paying those fees, it still incurred debt to fund the dividend. (Doc. 153 at 27 ¶ 78, 32 ¶ 109, 33 ¶ 112). As a result, it was immediately unable to meet its payroll obligations without incurring more debt. (*Id.* at 38 ¶¶ 133–35). This is sufficient to plausibly state a claim for constructively fraudulent transfer. The court therefore **GRANTS** the motion to file a second amended complaint with respect to Count Two.

    3.  <u>Count Three (Constructively Fraudulent Transfer—Insolvency)</u>

In Count Three, Mr. Reynolds alleges constructively fraudulent transfer, under Alabama Code § 8-9A-5(a). (Doc. 153 at 44). That section provides that a constructively fraudulent transfer occurs "if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer." Ala. Code § 8-9A-5(a).

The Fund IV Defendants argue that Mr. Reynolds has not adequately alleged that Atherotech was insolvent at the time of the dividend recapitalization because he relies on the company's book value instead of a fair valuation of the company, the Houlihan Lokey solvency opinion found that Atherotech's assets exceeded its liabilities by up to $66 million, and he has overestimated the contingent liability for any False Claims Act or Anti-Kickback Statute violations. (Doc. 155 at 20–28). The court has already rejected each of these arguments. Under the liberal pleading

standard, Mr. Reynolds has adequately alleged that Atherotech was insolvent at the time of the dividend payment.  The proposed second amended complaint therefore states a claim for constructively fraudulent transfer.  The court **GRANTS** the motion to file the second amended complaint with respect to Count Three.

## III.    CONCLUSION

The court **DENIES** the Fund IV Defendants' motion to dismiss this case.  The court **GRANTS IN PART** and **DENIES IN PART** Mr. Reynolds' motion to file a second amended complaint.  The court **DENIES** the motion with respect to the addition of the Foreign Limited Partners, but otherwise **GRANTS** the motion. Before filing the second amended complaint on the docket, Mr. Reynolds must remove the Foreign Limited Partners as defendants.  He must file the corrected second amended complaint on the docket **on or before January 21, 2022**.

Given the procedural history of this case, the parties have not yet filed a report of parties planning, as required by Federal Rule of Civil Procedure 26(f).  the court **DIRECTS** the parties to confer and file their Rule 26 report **on or before February 1, 2022**.

**DONE** and **ORDERED** this January 18, 2022.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE