FILED

2023 Aug-22  AM 11:22
U.S. DISTRICT COURT
N.D. OF ALABAMA

# IN THE UNITED STATES DISTRICT COURT
## FOR THE NORTHERN DISTRICT OF ALABAMA
### SOUTHERN DIVISION

| | | |
|---|---|---|
| **THOMAS E. REYNOLDS, as Trustee,** | ] | |
| | ] | |
| **Plaintiff,** | ] | |
| | ] | |
| **v.** | ] | **2:18-cv-00514-ACA** |
| | ] | |
| **BEHRMAN CAPITAL IV LP, et al.,** | ] | |
| | ] | |
| **Defendants.** | ] | |

## <u>MEMORANDUM OPINION AND ORDER</u>

Thomas Reynolds, as chapter 7 trustee for the estates of Atherotech Inc. ("Atherotech") and its parent company, Atherotech Holdings ("Holdings"), filed this action against a large number of defendants, of whom twenty remain.[1] In June 2013, Atherotech executed a dividend recapitalization under which it borrowed $40.5 million and immediately paid $31 million to Holdings' majority shareholder, Defendant Behrman Capital IV, LP ("Fund IV"), and Fund IV's general partner, Behrman Brothers IV, LLC ("Behrman Brothers"). Fund IV and Behrman Brothers in turn distributed the funds to the other defendants. Mr. Reynolds alleges that at the

---

[1] The remaining defendants are (1) Behrman Capital IV, LP; (2) Behrman Brothers IV, LLC; (3) Core Americas/Global Holdings, LP; (4) CS Strategic Partners IV Investments, LP; (5) Global Fund Partners II, LP; (6) Metlife Insurance Company of Connecticut; (7) Portfolio Advisors Secondary Fund, LP; and (8) Stepstone Private Equity Partners III, LP; (9) Amanda Zeitlin; (10) Greg M. Berhman; (11) Gregory J. Chiate; (12) Gary Dieber; (13) the Douglas E. Behrman Trust; (14) Mark V. Grimes; (15) the Kimberly B. Berhman Trust; (16) Simon Lonergan; (17) William M. Matthes; (18) Michael Rappaport; (19) Pradyut Shah; and (20) Jeffery S. Wu. (Doc. 165 at 4–7 ¶¶ 9–26).

time of the dividend recapitalization, Atherotech was insolvent in part because of its contingent liabilities relating to violations of the Anti-Kickback Statute and liability under the False Claims Act. Almost three years after the recapitalization, Atherotech and Holdings declared bankruptcy. Mr. Reynolds claims that the dividend recapitalization was a fraudulent transfer and seeks to recover the dividend paid to Defendants. (Doc. 165).

Mr. Reynolds offers three experts in support of his claims. The first, Christopher Haney, opines that (1) an effective compliance program would have assessed a significant likelihood of government enforcement of the False Claims Act with high risk to Atherotech if it occurred, and (2) if the government had brought a successful False Claims enforcement action against Atherotech, the estimated financial resolution would have been $84 million in June 2013 or $110.9 million in June 2014. (Doc. 211-104 at 76). The second expert, Christopher Kearns, opines that (1) Atherotech was insolvent in June 2013, and (2) Atherotech did not receive reasonably equivalent value for the dividend paid to Fund IV. (Doc. 211-101 at 98–99). The third expert, Steve Boyd, opines that (1) the prohibition on the payment of processing and handling ("P&H") fees was reasonably foreseeable in June 2013; (2) Atherotech's loss of one of its largest customers was reasonably foreseeable in June 2013; and (3) Atherotech's high employee turnover, which negatively affected

its sales performance, was reasonably foreseeable in June 2013. (Doc. 211-108 at 68–70).

Defendants move to exclude those opinions under Federal Rule of Civil Procedure 702 and *Daubert v. Merrell Dow Pharmaceuticals, Inc.*, 509 U.S. 579 (1993). The court **GRANTS IN PART** and **DENIES IN PART** Defendants' motion. The court **DENIES** the motion to exclude Mr. Haney's and Mr. Kearns' opinions because Mr. Reynolds has carried his burden of showing the admissibility of their testimony. The court **GRANTS** the motion to exclude Mr. Boyd's opinions because he is not qualified to offer them and he did not use any reliable methodology to reach them.

## I.    BACKGROUND

Mr. Reynolds asserts three substantive claims against the defendants: (1) intentional fraudulent transfer, under 11 U.S.C. § 544 and Alabama Code § 8-9A-4(a); (2) constructive fraudulent transfer, under 11 U.S.C. § 544 and Alabama Code § 8-9A-4(c); and (3) constructive fraudulent transfer, under 11 U.S.C. § 544 and Alabama Code § 8-9A-5(a). (Doc. 165 at 29–34). His remaining claims seek recovery of the allegedly fraudulent transfers. (*Id.* at 34–36).

The Bankruptcy Code section on which Mr. Reynolds relies provides that "the trustee may avoid any transfer of an interest of the debtor in property or any obligation incurred by the debtor that is voidable under applicable law." 11 U.S.C.

§ 544(b)(1). In this case, "[a]pplicable law" is Alabama law. *Cf. In re Custom Contractors, LLC*, 745 F.3d 1342, 1348–49 (11th Cir. 2014) (using state law to determine whether transfers were fraudulent under § 544). Mr. Reynolds claims that Atherotech's and Holdings' transfers to Defendants were either intentionally or constructively fraudulent, under Alabama Code §§ 8-9A-4(a), 8-9A-4(c), or 8-9A-5(a).

Under Alabama law, an intentional fraudulent transfer occurs where "the debtor made the transfer with actual intent to hinder, delay, or defraud any creditor of the debtor."  Ala. Code § 8-9A-4(a). A constructive fraudulent transfer occurs if the debtor did not receive a reasonably equivalent value in exchange for the transfer and either the debtor's remaining assets "were unreasonably small in relation to the business or transaction" or the debtor "believed or reasonably should have believed that he or she would incur[ ] debts beyond his or her ability to pay as they became due." *Id.* § 8-9A-4(c). A constructive fraudulent transfer also occurs "if the debtor made the transfer without receiving a reasonably equivalent value in exchange for the transfer and the debtor was insolvent at that time or the debtor became insolvent as a result of the transfer." *Id.* § 8-9A-5(a).

## II.    DISCUSSION

Defendants seek to exclude the expert witness testimonies of Mr. Haney, Mr. Kearns, and Mr. Boyd under Federal Rule of Evidence 702 and *Daubert v. Merrell Dow Pharmaceuticals*, 509 U.S. 579 (1993). (Doc. 226). Under Rule 702,

> [a] witness who is qualified as an expert by knowledge, skill, experience, training, or education may testify in the form of an opinion or otherwise if:
>
> > (a) the expert's scientific, technical, or other specialized knowledge will help the trier of fact to understand the evidence or to determine a fact in issue;
> >
> > (b) the testimony is based on sufficient facts or data;
> >
> > (c) the testimony is the product of reliable principles and methods; and
> >
> > (d) the expert has reliably applied the principles and methods to the facts of the case.

Fed. R. Evid. 702. In other words, a court determining the admissibility of expert testimony must consider whether (1) the expert is qualified to testify; (2) the expert's methodology is "sufficiently reliable"; and (3) the testimony will assist "the trier of fact, through the application of scientific, technical, or specialized expertise, to understand the evidence or to determine a fact in issue." *United States v. Frazier*, 387 F.3d 1244, 1260 (11th Cir. 2004) (en banc). The party introducing the expert testimony bears the burden of establishing each of those requirements by a preponderance of the evidence. *Id.*; *Daubert*, 509 U.S. at 592 & n.10.

But "Rule 702 is a *screening* procedure, not an opportunity to substitute the trial court's judgment for that of a jury." *United States v. Barton*, 909 F.3d 1323,

1332 (11th Cir. 2018) (emphasis in original). The court cannot "make ultimate conclusions as to the persuasiveness of the proffered evidence, and vigorous cross-examination, presentation of contrary evidence, and careful instruction on the burden of proof are the traditional and appropriate means of attacking shaky but admissible evidence." *Id.* (cleaned up). Indeed, "the proponent of the testimony does not have the burden of proving that it is . . . correct, but that by a preponderance of the evidence, it is reliable"; the court's focus is "on principles and methodology, not on the conclusions that they generate." *Allison v. McGhan Med. Corp.*, 184 F.3d 1300, 1312 (11th Cir. 1999) (quotation marks omitted).

1. Mr. Haney's Expert Testimony

Mr. Haney is a certified public accountant, a certified fraud examiner, and certified in healthcare compliance. (Doc. 211-104 at 113). Mr. Reynolds retained him to evaluate Atherotech's "compliance risks" relating to the payment of P&H fees and to estimate the cost of resolving government enforcement of the False Claims Act if enforcement had occurred. (*Id.* at 74). Mr. Haney offers two opinions and Defendants challenge both. The court will address each opinion separately.

a. *Mr. Haney's First Opinion*

Mr. Haney's first opinion is that an effective compliance program would have alerted Atherotech to the risk of a high impact from government enforcement and the significant likelihood of the enforcement occurring. (Doc. 211-104 at 76, 88–

103). "High impact" of risk occurring means that if the risk occurred, the company would face "[f]ines, penalties and/or legal exposure in excess of 1% of net revenue." (*Id.* at 93). A "significant likelihood" of the risk occurring means "[l]ikelihood of occurrence in up to 50% of facilities or service lines. Government emphasis on industry enforcement and/or history of enforcement at the company." (*Id.* at 94). And an "enforcement action" is "what occurs at the end of the investigation if the government chooses to pursue enforcement, whether that's litigation, indictments, whatever it may be." (*Id.* at 5).

To form his risk assessment opinion, Mr. Haney used a "failure mode and effects analysis," which "involves identifying the potential impact a risk might have on an organization ('Impact') and the likelihood that a risk may actually occur ('Likelihood')." (Doc. 211-104 at 83) (emphasis omitted). Criteria for the "impact" assessment include "financial, reputational, regulatory, and operational impacts, among others," and criteria for the "likelihood" assessment include "the percentage of business services at issue, industry trends, and/or whether the company has reason to believe an investigation or enforcement is likely, among others." (*Id.* at 83–84).

Mr. Haney based this opinion on "[a]mple industry and regulatory guidance" regarding "the specific risks to clinical laboratories for paying *any* remuneration to referring physicians." (*Id.* at 92). Mr. Haney also relied on evidence that, despite having initially ceased payments of P&H fees based on that guidance, Atherotech

(1) resumed paying P&H fees in 2009 to generate testing referrals, continuing even after receiving legal advice that P&H fees were not covered by the safe harbor provision; (2) requested a fraud alert about P&H fees; and (3) reported a competitor to the Department of Justice ("DOJ") for paying P&H fees. (*Id.*). Mr. Haney found "most significant[ ]" the fact that the DOJ was actively investigating Atherotech for paying P&H fees, "which represented approximately 30 percent of Atherotech's total direct revenue." (Doc. 211-104 at 92).

After assessing the impact if the risk occurred and the likelihood of the risk occurring, Mr. Haney assessed Atherotech's compliance program and concluded that it was ineffective. (*Id.* at 94–103). He reached this opinion by reviewing the controls Atherotech used to mitigate risk, including memoranda from attorney Gregory Root and regulatory compliance company CodeMap, Atherotech's compliance policy, Atherotech's agreement template for physicians who were paid P&H fees, Atherotech's time and motion studies on the fair market value of P&H fees, and CodeMap's annual compliance audits of Atherotech. (*Id.* at 94–95).

Mr. Haney found Mr. Root's and CodeMap's memoranda inadequate, from a compliance perspective, based on Mr. Root's lack of experience, the hazy reasons Atherotech's chief compliance officer gave for relying on Mr. Root and CodeMap, and concerns about the strength of Mr. Root's legal analysis, especially given Mintz Levin's contradictory advice about the applicability of the safe harbor provision. (*Id.*

at 97–98). He also found that the compliance policy and the P&H agreement template were not good controls because they were based on CodeMap's memoranda about how to achieve safe harbor. (Doc. 211-104 at 99–100). He expressed that Atherotech's time and motion studies were unreliable and lacked independence. (*Id.* at 101–02). And he found CodeMap's annual compliance audits lacked independence and objectiveness because it was auditing the conduct it had advised Atherotech to engage in. (*Id.* at 102–03).

Defendants seek to exclude this opinion on the grounds that (1) Mr. Haney is not qualified to opine about whether Atherotech's P&H fees violated the Anti-Kickback Statute or the quality of any legal advice Atherotech received from Mr. Root and Mintz Levin; (2) the Eleventh Circuit already held, in a related case, that Mintz Levin provided reasonable legal advice to Atherotech; and (3) Mr. Haney's opinion about the strength of Atherotech's compliance program is irrelevant. (Doc. 226 at 26–27). Mr. Reynolds responds that Mr. Haney has not offered any opinion about whether Atherotech's P&H fees violated the Anti-Kickback Statute; his opinion relates to the risk, from a compliance perspective in June 2013, that the government might pursue an enforcement action. (Doc. 235 at 23–24). Mr. Reynolds further argues that Mr. Haney's opinion is relevant to the amount of any contingent liability Atherotech faced in June 2013. (*Id.* at 25–26).

As an initial matter, the court finds Mr. Haney qualified to offer his opinion about the effectiveness of Atherotech's compliance program and how an effective compliance program would have evaluated Atherotech's risk of government enforcement. (*See* doc. 211-104 at 74–75, 112–13). In addition to his certification in healthcare compliance, he has extensive experience evaluating healthcare companies' compliance programs (*id.* at 75); *see Frazier*, 387 F.3d at 1260–61.

Defendants argue that Mr. Haney is unqualified to offer an opinion about the risk of an Anti-Kickback Statute enforcement action or the soundness of any legal advice Atherotech received because he is not a lawyer. (Doc. 226 at 26–28). But Mr. Haney's opinion does not purport to offer a legal conclusion about whether Atherotech's P&H fees violated the Anti-Kickback Statute. (Doc. 211-104 at 9, 17). Instead, he opines that if the government pursued a successful enforcement action against Atherotech, the financial impact on Atherotech would have been high. (*Id.* at 93). He further opines that, from a compliance perspective, the likelihood of the government pursuing an enforcement action was significant. (*Id.*). His assessment of the likelihood of an enforcement action was not based on the likelihood that any action would be successful; it was about how a compliance officer would have rated the risk of an enforcement action as of June 2013. (*See id.* at 17–18, 83–84, 92, 94).

Likewise, Defendants' argument that Mr. Haney offered an unqualified legal opinion on whether memoranda and statements from Mr. Root and Mintz, Levin,

Cohn, Ferris, Glovsky and Popeo, P.C., could establish an advice of counsel defense is simply wrong. Indeed, Mr. Haney expressly disclaimed any attempt to offer such an opinion. (Doc. 211-104 at 96). Instead, he weighed considerations a compliance officer should consider when reviewing a legal opinion, such as whether a qualified and reliable law firm or attorney provided the advice; whether the attorney had all the relevant facts; whether the legal advice was presented in writing; whether the legal advice seemed reasonable; whether a second legal opinion existed; whether the company had received contradictory legal advice; and whether the company followed the advice. (*Id.*).

It was in this context that Mr. Haney addressed Mintz Levin's advice—or more precisely, the lack thereof. (*See id.* at 98). His report states that the information provided to him did not support Defendants' contention that Mintz Levin's legal advice could mitigate risk of enforcement because he could not find "any evidence Mintz Levin provided such advice." (Doc. 211-104 at 95). Statements regarding what information Mr. Haney found do not constitute legal advice and the court presumes Defendants are well aware of this fact. After all, their motion in limine raises the claim while ignoring the fact that Mr. Haney expressly acknowledged Mintz Levin attorney Hope Foster's deposition testimony that an advice of counsel defense could come only from CodeMap's advice. (*Id.*; *see also* doc. 211-19 at 175–76, 200–02). Instead, Defendants ask the court to accept that because the Eleventh

Circuit held, in a separate case, that Mintz Levin did not commit legal malpractice by failing to tell Atherotech to stop paying P&H fees, *see Reynolds v. Mintz, Levin, Cohn, Gerris, Glovsky and Popeo, P.C.*, No. 20-13581, 2021 WL 4627905, at *4 (11th Cir. Oct. 7, 2021), Mintz Levin's "legal advice was reasonable" and Mr. Haney cannot offer an opinion to the contrary (doc. 226 at 27) (emphasis omitted). The court declines Defendants' invitation. Mr. Haney has not opined that Mintz Levin provided unreasonable advice; he states instead that he is not aware of any legal advice Mintz Levin offered before the dividend recapitalization relating to the risk of government enforcement. (Doc. 211-104 at 95).

Mr. Haney also offered his opinions about whether Mr. Root's legal advice could qualify to mitigate risk. (Doc. 211-104 at 96–99). Defendants make only passing reference to Mr. Haney's analysis in their motion in limine (doc. 226 at 27), and for good reason. Mr. Haney applied the accepted methodology set out above and determined, from a risk perspective, whether the legal advice was designed to mitigate the risk. (Doc. 211-104 at 96). Mr. Haney's reference to Ms. Foster's legal opinion that Mr. Root provided inaccurate legal advice does not constitute Mr. Haney's own legal advice. The weight Mr. Haney gave to the memoranda was based on his experience and knowledge as a compliance professional and he analyzed Mr. Root's experience and the strength of the memoranda and audits in that light. (*See id.* at 96–103). The court finds that Mr. Reynolds has established by a

preponderance of the evidence that Mr. Haney is qualified to offer his compliance opinions.

Second, the court finds Mr. Reynolds' methodology to be sufficiently reliable. *See Frazier*, 387 F.3d at 1260. To evaluate the reliability of an expert opinion, the court considers "whether the reasoning or methodology underlying the testimony is scientifically valid and whether that reasoning or methodology can properly be applied to the facts in issue." *Frazier*, 387 F.3d at 1261–62 (cleaned up). Facts the court may consider include "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the scientific community." *Id.* at 1262 (quotation marks omitted); *see also id.* ("The same criteria that are used to assess the reliability of a scientific opinion may be used to evaluate the reliability of non-scientific, experience-based testimony."). But those "factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally important in evaluating the reliability of proffered expert opinion." *Id.*

Mr. Haney explained that he formed his first opinion by using a framework established by the Committee of Sponsoring Organizations ("COSO"), which "is used by organizations in a variety of industries and sectors, both large and small,"

and which the Securities and Exchange Commission acknowledges is "a suitable framework for assessing internal control." (Doc. 211-104 at 83). Mr. Haney specifically used COSO's *Enterprise Risk Management – Integrated Framework*, including its "failure mode and effects analysis." (*Id.*). The "failure mode and effects analysis" has "been used by the military, automotive, and aerospace industries, among others, for over 50 years and are routinely taught in coursework and continuing education for compliance professionals." (*Id.*).

Moreover, Mr. Haney reliably applied the methodology to the facts of this case. (*Id.* at 88–103). In reaching his opinion about the impact and likelihood of government enforcement, he reviewed applicable regulatory guidance, the legal advice Atherotech received, Atherotech's actions in response to that regulatory guidance and legal advice, and Atherotech's financial reports. (Doc. 211-104 at 88–92). He then applied the criteria set out by the COSO framework to reach his opinion. (*Id.* at 93–94).

To reach his opinion about the strength of Atherotech's compliance program, Mr. Haney reviewed its "controls related to the risk of Government enforcement": the legal advice Atherotech received, its compliance policy, its agreement template for use when contracting with physicians for payment of P&H fees, its time and motion studies, and its annual compliance audits. (*Id.* at 94–95). He then evaluated whether a compliance professional would have considered those controls sufficient

to mitigate risk. (*Id.* at 95–96). Mr. Haney's explanations of how he reached that opinion shows a reliable application of the factors he considered. (*See id.* at 96–103). Accordingly, the court finds that Mr. Reynolds has established by a preponderance of the evidence that Mr. Haney reliably applied a sufficiently reliable methodology.

The last question is whether Mr. Haney's opinion will assist the trier of fact to understand the evidence or determine a fact in issue. Fed. R. Evid. 702(a); *Frazier*, 387 F.3d at 1260. The court finds that Mr. Haney's opinion about the impact and likelihood of government enforcement would assist the factfinder to determine whether Atherotech had or knew about a contingent liability at the time of the dividend recapitalization in June 2013. Likewise, the court agrees with Mr. Reynolds that the strength of Atherotech's compliance program would assist the trier of fact in determining the amount of any contingent liability Atherotech faced in June 2013. (Doc. 235 at 25–26). The court therefore **DENIES** the motion to exclude Mr. Haney's first opinion.

### b.  Mr. Haney's Second Opinion

Mr. Haney's second opinion is that if the government had brought a successful False Claims Act enforcement action against Atherotech, resolution of that action would have been double the reimbursement for every specimen for which Atherotech both paid a P&H fee and received government reimbursement. (Doc. 211-104 at 76, 104–08). To reach this opinion, Mr. Haney assumed that the

government would have brought an enforcement action against Atherotech, that the False Claims Act claims would have been based on improper payment of P&H fees, that the enforcement action would have been successful, and that Atherotech and its owners would have had the financial ability to resolve the enforcement. (*Id.* at 104).

Based on those assumptions, Mr. Haney first estimated what he calls "single damages"—"the amount reimbursed by the Government for laboratory tests where P&H fees were paid." (*Id.* at 104–07). To reach this number, Mr. Haney calculated the amount of P&H fees paid for specimens with relevant[2] government reimbursements; the number of specimens with relevant government reimbursement and draw fees; the proportion of relevant government specimens with draw fees; the total number of relevant government specimens; the aggregate relevant government reimbursements from 2006 to 2013; and the average government reimbursement for each of those specimens. (*Id.* at 104–06). Using these numbers, he estimated that between January 2009 and June 2013, single damages amounted to $42,009,987. (*Id.* at 106).

Mr. Haney then estimated the amount of a reasonable resolution—"the amount Atherotech would *actually* be anticipated to pay if it faced successful [False Claims Act enforcement *and* resolved that enforcement through a settlement

---

[2] Mr. Haney did not include claims reimbursed by Medicare Advantage, which does not reimburse P&H fees. (Doc. 211-104 at 104).

agreement." (*Id.* at 108). Because the False Claims Act mandates treble damages, a per-claim penalty of $5,500 to $11,000, and litigation costs, a single damages amount of $42 million would result in over $5 billion in liability. (*Id.* at 107). But Mr. Haney opined that the statutory penalties "are typically not applied in this fashion" and most False Claims Act "matters are resolved for amounts less than treble damages by way of settlement agreements." (Doc. 211-104 at 107–08). In his opinion, multiplying the single damages amount by a multiplier of two is a "reasonable basis for estimating Atherotech's resolution, if successful [False Claims Act] enforcement had been brought." (*Id.* at 108).

To reach the multiplier of two, Mr. Haney relied on both his personal experience and a study performed by Professor Jacob Elberg. (*Id.* at 108). With respect to personal experience, Mr. Haney explained that he worked as a forensic accountant specializing in complex healthcare and white collar violations for the FBI, as a director in the Disputes and Investigations practice at a global consulting firm, and he is now the managing director at a forensic accounting and investigative consulting firm. (*Id.* at 74). At his current firm, he "routinely evaluate[s] healthcare data to estimate financial damages in reimbursement disputes and regulatory enforcement matters." (Doc. 211-104 at 75). He testified that he has worked "on dozens of False Claims Act cases" over fifteen years "where the multiplier in many of those cases was a direct part of my analysis." (*Id.* at 34). But he could not provide

a list of cases he had worked on because many of them were confidential and he could not provide data from those cases because they "are protected." (*Id.* at 34–35). The only data he could provide was the study performed by Professor Elberg. (*Id.* at 35).

In addition to his personal experience, Mr. Haney relied on Professor Elberg's study of eighty-nine healthcare civil settlement agreements under the False Claims Act. (Doc. 211-104 at 108). The study is *A Path to Data-Driven Health Care Enforcement*, 2020 Utah L. Rev. 1169 (2020). In that study, Professor Elberg reviewed 118 publicly disclosed civil settlement agreements between the DOJ and health care business organizations under the False Claims Act. *Id.* at 1193–94. Among other data, Professor Elberg tracked "the dollar amount of the resolution" and "the amount of the resolution which constituted restitution." *Id.* at 1193. Professor Elberg equated "restitution" to "single damages" under the False Claims Act. *See id.* In a footnote, Professor Elberg noted that "[b]y its definition, 'restitution' should not be impacted by litigation risk, compliant behaviors, or other factors." Elberg, *supra*, at 1194 n.99. But he acknowledged the possibility of "horse trading"—that the DOJ may not be "accurately reporting restitution figures, or . . . DOJ and defendants may in some cases be agreeing on a resolution figure and then engaging in additional negotiation regarding the percentage attributable to restitution." *Id.* Eighty-nine of the 118 agreements disclosed the restitution amount.

18

*Id.* at 1194. Thirty-four of the cases used a multiplier less than two, forty-four cases used a multiplier of two, and eleven used a multiplier higher than two. *Id.*

Relying on Professor Elberg's data and his own experience in resolution of False Claims Act cases, Mr. Haney opined that that a multiplier of two is a reasonable basis to estimate the cost of resolution in the face of a False Claims Act enforcement action. (Doc. 211-104 at 108). Because Mr. Haney had calculated that the amount of single damages was $42,009,987, he doubled that amount to reach $84 million as his estimate of a reasonable resolution of a government enforcement action as of June 28, 2013. (Doc. 211-104 at 108).

First, the court finds that Mr. Haney is qualified to offer his opinion about how to calculate the single damages amount. Mr. Haney is a certified public accountant and a certified fraud examiner. (Doc. 211-104 at 75). He has worked many years of experience in "investigative analysis[ ] and forensic accounting in a variety of civil and criminal healthcare disputes," including for the Department of Justice Civil Frauds Section. (*Id.*).

Next, the court finds that Mr. Haney's methodology for estimating the single damages amount is sufficiently reliable and that he reliably applied that methodology to the facts of this case. *See* Fed. R. Evid. 702(c)–(d); *Frazier*, 387 F.3d at 1260. Mr. Haney described how he used raw data from Atherotech to determine (1) how much Atherotech paid in P&H fees for specimens for which the

government reimbursed Atherotech; (2) the proportion of specimens for which Atherotech received government reimbursement; and (3) the aggregate government reimbursement for tests per year. (Doc. 211-104 at 104–06). He also described how he calculated: (1) the number of specimens per year for which Atherotech paid a draw fee and received reimbursement from the government; (2) the total number of specimens with government reimbursement; (3) the average government reimbursement per specimen; and (4) the total amount the government reimbursed Atherotech for tests for which Atherotech paid a P&H fee. (*Id.*).

Defendants contend that Mr. Haney's methodology is unreliable because he misunderstood Professor Elberg's study as saying that the single damages amount is the maximum potential single damages, when in fact the single damages amount is negotiated between the parties and will almost never represent the maximum potential single damages. (Doc. 226 at 15–18). In support, Defendants submit an expert report from Professor Elberg, who opines that False Claims Act cases consistently settle for far less than the maximum potential single damages and that it would be impossible to estimate a likely settlement amount in this case. (Doc. 211-109 at 7, 9, 11).

The court does not find that this argument casts any doubt on the reliability of Mr. Haney's methodology in calculating the damages the government suffered (assuming that Atherotech's payment of P&H fees did, in fact, damage the

government). Defendants' challenge to Mr. Haney's methodology is that he should have accounted for the fact that parties negotiating a settlement will reduce the damages amount before applying a multiplier to reach the total settlement. (*See* doc. 226 at 15–18). But this is a challenge to the persuasiveness of Mr. Haney's opinion, not his methodology in reaching the single damages amount. *See Quiet Tech. DC-8, Inc. v. Hurel-Dubois UK Ltd.*, 326 F.3d 1333, 1346 (11th Cir. 2003) ("[N]ormally, failure to include variables will affect the analysis' probativeness, not its admissibility.") (quotation marks omitted).

Finally, the court finds that Mr. Haney's opinion about the single damages amount would assist the trier of fact. *See Frazier*, 387 F.3d at 1262–63. A layperson would not be able to make the same calculations that Mr. Haney did in reaching that number. *See id.* at 1262. And, assuming the trier of fact finds that Atherotech had a contingent liability, that trier of fact will need to determine the amount of the contingent liability. Mr. Haney's opinion about that number will be helpful to the trier of fact. Accordingly, the court will not exclude Mr. Haney's opinion about a reasonable estimate of single damages.

Mr. Haney's opinion did not end with his estimate of single damages. He also opined that "a multiplier of 2.0x [would] be a reasonable basis for estimating Atherotech's resolution, if successful [False Claims Act] enforcement had been brought." (Doc. 211-104 at 108). As a result, in his opinion, it was reasonable to

estimate that resolving a government enforcement action would have cost Atherotech $84 million—two times the single damages amount of $42 million. (*Id.*). Again, the court must address his qualifications, the reliability of his methodology, and the helpfulness of his opinion.

First, the court finds Mr. Haney qualified to offer this opinion. Although he could not provide a list of cases he had worked on due to confidentiality issues, he testified that he has been involved in negotiations over the appropriate multiplier in over a dozen cases over the course of fifteen years. (Doc. 211-104 at 6, 31; *see also id.* at 74–75, 108, 114). The court also finds Mr. Haney's methodology to be reliable based on the language of the False Claims Act, 31 U.S.C. §§ 3729(a)(1) (requiring treble damages plus penalties in normal cases), 3729(a)(2) (permitting as low as double damages based on the violator's cooperation), the content of Professor Elberg's study (doc. 211-104 at 108), and Mr. Haney's experience in negotiating settlements (*Id.* at 23–25) (testifying about the factors negotiators will consider). Finally, the court finds that Mr. Haney's opinion would assist the trier of fact. *See Frazier*, 387 F.3d at 1262–63. Assuming the trier of fact finds that Atherotech had a contingent liability, having Mr. Haney's estimate of a reasonable resolution of a government enforcement action would help the factfinder to determine the amount of that contingent liability. Accordingly, the court **DENIES** the motion to exclude Mr. Haney's second opinion.

2.  Mr. Kearns

Mr. Kearns is a certified public accountant, a certified insolvency and restructuring advisor, a certified turnaround professional, and a certified fraud examiner, with "over 40 years of broad-based financial experience as an auditor, corporate officer and, for approximately the last 31 years, as an advisory or crisis manager in bankruptcy and turnaround matters." (Doc. 211-101 at 96, 149).

Mr. Kearns opines Atherotech was insolvent as of June 28, 2013, continuing through 2018. (Doc. 211-101 at 131–39). Consistent with the solvency opinion prepared by Houlihan Lokey, Mr. Kearns used three solvency tests. (*Id.* at 137). First, under the "balance sheet test," a company is insolvent "if the fair value of assets exceeds debt." (*Id.*). Houlihan Lokey had found that Atherotech was solvent under this test because it had an equity cushion of $54.1 to $66 million. (Doc. 209-83 at 6; doc. 209-84 at 12). Mr. Kearns opined that, accepting Mr. Haney's calculation of an $84 million contingent liability as of June 2013, Atherotech would have been insolvent because its liabilities exceeded its assets. (Doc. 211-101 at 116, 137).

The second test is the "cash flow test," under which the assessor must look at the company's financial projections to see whether the "expected future cash flows

of a business are sufficient to meet its liabilities as they come due." (*Id.* at 137). Using Atherotech's projected revenues and expenses, Houlihan Lokey found that Atherotech passed the cash flow test, with the cash balance ranging from $2.1 million to $13.5 million in its "base case" and $2 million to $7.8 million in its "sensitivity case" (which assumed slower revenue growth and higher expenses). (Doc. 209-84 at 9, 16; doc. 209-83 at 2, 6).

Mr. Kearns disagrees with Houlihan Lokey's analysis on the ground that "it was known or knowable that each dollar of Medicare-based revenue generated by the continued payment of P&H fees would result in an accruing liability that was not reflected in Atherotech's financial statements, the Projections, or considered in Houlihan's solvency analysis.". (Doc. 211-101 at 133). Mr. Kearns again accepted Mr. Haney's calculation of an $84 million contingent liability as of June 2013, but he also estimated ongoing liability from June 2013 through 2018 based on Atherotech's financial projections. (*Id.* at 131). Using Mr. Haney's multiplier of two and applying a discount rate (the weighted average cost of capital) used by Houlihan Lokey, Mr. Kearns estimated that Atherotech would incur an additional $376.2 million in penalties between June 2013 and 2018. (*Id.*). Adding the pre-June 2013 contingent liability of $84 million amounted to a total cumulative liability of $342 million. (*Id.*). Mr. Kearns further opined that if he used the statutory treble damages instead of the multiplier of two, the total cumulative liability, discounted to present

value, would be $528 million. (Doc. 211-101 at 131–32). Mr. Kearns concluded that "[a]t no point in time following [June 28, 2013] would Atherotech have the ability to pay its debts as they came due since there are (i) substantial risk-adjusted liabilities, which were growing as additional P&H Fees were paid; and (ii) after reflecting the financing for the [dividend recapitalization], Atherotech lacked the liquidity to satisfy these liabilities and its obligations." (*Id.* at 137–38).

The final test is the "capital adequacy test," under which a company is insolvent if it lacks "a reasonable amount of capital." (*Id.* at 137). Houlihan Lokey, using its calculation for Atherotech's equity cushion, found that Atherotech's "implied reference range of equity cushion" was 56.1 to 60.9%. (Doc. 209-84 at 9, 19). Mr. Kearns disagreed. (Doc. 211-101 at 138). In his view, because Atherotech did not have the ability to pay debts as they came due, it was not a creditworthy borrower and it had only its cash position and the $5 million revolver as internal sources of liquidity. (*Id.*). Mr. Kearns stated that Atherotech's "minimal liquidity" meant Atherotech would be unable to "pay the growing amount of liabilities" and withstanding the downturn in business from ending the payment of P&H fees. (*Id.*). Specifically, he opined that "on a risk-adjusted basis, only 15% of the projected cumulative FCA liability [of $342 million] would render [Atherotech] insolvent." (*Id.*).

The court finds that Mr. Kearns is qualified to offer his solvency opinions. He has both professional credentials in accountancy and insolvency as well as many years of experience "as an auditor, corporate officer and . . . advisor or crisis manager in bankruptcy and turnaround matters." (Doc. 211-101 at 96, 141–49).

The court also finds that Mr. Kearns' methodology is reliable and that he reliably applied it. He used the same methodology as Houlihan Lokey used in its solvency opinion, although he chose different numbers to input into his calculations. (*See generally* doc. 211-101 at 126–39). There does not appear to be any dispute that his math is correct. Instead, Defendants challenge his methodology because he used Mr. Haney's opinion about a reasonable estimate for a settlement as one of the inputs to calculate Atherotech's solvency. (Doc. 226 at 21–22). But even assuming that Mr. Haney's opinion is itself unreliable, "misus[ing] a method that, in the abstract, is reliable" is a flaw "impugn[ing] the accuracy of his results, not the general scientific validity of his methods." *Quiet Tech. DC-8, Inc.*, 326 F.3d at 1345. "The identification of such flaws in generally reliable scientific evidence is precisely the role of cross-examination." *Id.*

The court also finds unpersuasive Defendants' argument that Mr. Kearns could not value the contingent liability based on Mr. Haney's opinion because Mr. Haney's opinion relied on Professor Elberg's study, which discussed settlements reached in 2018 through 2019. (Doc. 226 at 22–23). Defendants contend

that an expert cannot rely on an unreliable expert opinion. (*Id.*). To the extent Defendants' motion is based on Mr. Kearns' reliance on Mr. Haney's opinion, the court has already rejected Defendants' argument about the admissibility of Mr. Haney's opinion. The court is therefore not persuaded that Mr. Kearns' reliance on Mr. Haney's opinion renders Mr. Kearns' opinion inadmissible. Moreover, there is no dispute that Mr. Kearns' methodology was correct; this is, again, a challenge to the inputs he used in following that methodology. As such, it is more appropriate for cross-examination than exclusion. *See Quiet Tech. DC-8, Inc.*, 326 F.3d at 1345.

Defendants also argue that Mr. Kearns cannot use Professor Elberg's study about the double multiplier because the study relied on settlements entered into after 2018, so that his finding about a double multiplier was not "known or knowable" in 2013. (Doc. 226 at 22–23). Defendants' argument ignores Mr. Haney's testimony that he considered other things in conjunction with Professor Elberg's study, including his own experience and the fact that the False Claims Act requires a minimum of double damages. (Doc. 211-104 at 108, 23–25, 33); *see* 31 U.S.C. §§ 3729(a)(1), (a)(2).

Finally, the court finds unpersuasive Defendants' argument that Mr. Kearns may not use Mr. Haney's calculation of the single damages, multiplied by statutory treble damages, to evaluate Atherotech's solvency, because Mr. Reynolds lacks an expert who has opined about the probability that Atherotech would actually be found

liable. (Doc. 226 at 24–26). The court agrees that "[t]he 'fair value' of a contingent liability, of course, should be discounted according to the possibility of its ever becoming real." *In re Advanced Telecomm. Network, Inc.*, 490 F.3d 1325, 1335 (11th Cir. 2007). The court also agrees that, contrary to Mr. Reynolds' argument (doc. 235 at 28), Mr. Kearns did not discount his estimate of the contingent liability by the probability it would ever become real: the discount Mr. Kearns applied was the discount Houlihan Lokey applied to the average cost of capital (doc. 211-101 at 131).

But ultimately, the court finds that this failure does not affect the reliability of Mr. Kearns' methodology; it affects only the weight a factfinder should give to his opinion. *See, e.g.*, *In re Chase & Sanborn Corp.*, 904 F.2d 588, 593–94 (11th Cir. 1990) (addressing the bankruptcy court's merits finding about how to value a contingent liability); *In re Advanced Telecomm. Network, Inc.*, 490 F.3d at 1335–36 (reversing the bankruptcy court's merits findings about the value of a contingent liability). An expert may testify about hypothetical facts. *See United States v. Henderson*, 409 F.3d 1293, 1300 (11th Cir. 2005); *see also* Fed. R. Evid. 702 cmt. to 2000 amendments (clarifying "that an expert opinion need not be excluded simply because it is based on hypothetical facts"). Accordingly, Mr. Kearns may testify that about the effect of the contingent liability based on a hypothetical situation in which there is a 100% likelihood that the contingent liability will become real. Defendants

may seek to persuade the factfinder that Mr. Kearn's (or Mr. Haney's) failure to apply a discount to the contingent liability makes the relevant opinions unpersuasive, but that is not an issue that calls for exclusion of the opinion. Again, it goes to the weight of the opinion.

Finally, the court finds that Mr. Kearns' testimony would assist the factfinder in determining whether Atherotech was solvent as of June 2013, which is a key fact relevant to all of Mr. Reynolds' substantive claims. Accordingly, the court **DENIES** the motion to exclude Mr. Kearns' expert opinion.

### 3.  Mr. Boyd

Mr. Boyd is a former laboratory technician who became a sales manager and then a regional vice president of sales for a laboratory. (Doc. 211-108 at 71). He eventually founded Southern Diagnostic Laboratories. (*Id.*). He now works as the chief executive officer of Southeast Clinical Laboratories. (*Id.*).

Mr. Boyd offers three opinions. (Doc. 211-108 at 66). First, he opines that "the vast majority of regional laboratories did not offer" P&H fees and any remuneration would be limited to the amount Medicare approved, so "it [was] unreasonable to conclude that the [P&H fee] arrangements were legal under the [Anti-Kickback Statute]" and "on June 28, 2013, it was foreseeable that within five years . . . the [Department of Health & Human Services] would issue a fraud alert that prohibited the payment of P&H fees." (*Id.* at 68–69). Second, he opines that on

June 28, 2013, "it was foreseeable that . . . Quest would stop sending volume to Atherotech, and Atherotech would no longer have that source of revenue." (*Id.* at 69–70). And third, he opines that as of June 2013, it was reasonably foreseeable that Atherotech would have high sales force turnover that would affect its sales. (*Id.*70).

Defendants seek to exclude Mr. Boyd's opinion on the grounds that he is not qualified to opine about the foreseeability of the OIG issuing a fraud alert, the foreseeability of Atherotech losing Quest as a source of revenue, or the foreseeability of Atherotech's sales force turnover; that his opinion was not based on any methodology but instead of "anecdotal conversations" with other laboratory executives; and that his opinions are irrelevant to Atherotech's solvency, capital, or ability to pay debts. (Doc. 226 at 30–32). Mr. Reynolds responds that Mr. Boyd is qualified because he has been working in the blood testing laboratory industry in Birmingham, Alabama, during the relevant time period and he worked at Quest, which was a major client of Atherotech, during the time Quest was looking to move away from Atherotech. (Doc. 235 at 31). Mr. Reynolds contends that Defendants' challenges to Mr. Boyd's qualifications relate to the weight and credibility of his testimony, not his qualifications. (Doc. 235 at 33).

Mr. Reynolds has not carried his burden of establishing that Mr. Boyd is qualified to offer the opinions he proffers and that his opinions are based on a reliable

methodology. *See Frazier*, 387 F.3d at 1260; *see also Daubert*, 509 U.S. at 592 & n.10. As a result, the court will not address the relevance of his opinions.

First, Mr. Boyd's lengthy experience as a laboratory technician and sales manager for laboratories does not qualify him to opine about the foreseeability of Atherotech's ability to continue paying P&H fees. (*See* doc. 211-108 at 71). Likewise, nothing in his report indicates that his work experience qualifies him to opine about the foreseeability that Quest would soon reduce its purchases of tests from Atherotech. (*See id.*). And finally, nothing in his report shows why he is qualified to opine about the foreseeability of or reasons for Atherotech's high sales force turnover. (*Id.*).

Second, Mr. Boyd's report does not set out any methodology supporting his opinions. (*See* doc. 211-108 at 68–71). To evaluate the reliability of an opinion, the court must determine whether the methodology is valid and can be applied to the facts. *Frazier*, 387 F.3d at 1261–62. This inquiry can include, among any other appropriate factors, "(1) whether the expert's theory can be and has been tested; (2) whether the theory has been subjected to peer review and publication; (3) the known or potential rate of error of the particular scientific technique; and (4) whether the technique is generally accepted in the [relevant] community." *Id.* at 1262 (quotation marks omitted). "These factors are illustrative, not exhaustive; not all of them will apply in every case, and in some cases other factors will be equally

important in evaluating the reliability of proffered expert opinion." *Id.* Mr. Reynolds does not address these factors or any others that would show the reliability of Mr. Boyd's methodology. (Doc. 235 at 31–34). Accordingly, he has not carried his burden of methodology either. The court therefore **GRANTS** the motion to exclude Mr. Boyd's proffered testimony.

## III.   CONCLUSION

The court **DENIES** the motion to exclude Mr. Haney's and Mr. Kearns' expert testimony. The court **GRANTS** the motion to exclude Mr. Boyd's expert testimony.

**DONE** and **ORDERED** this August 22, 2023.

_____
**ANNEMARIE CARNEY AXON**
UNITED STATES DISTRICT JUDGE